**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**May 31, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 22-2089 |
| | (D.C. No. 1:19-CR-03112-WJ-1) |
| JACQUAN ABE, | (D.N.M.) |
| Defendant - Appellant. | |

_____

**ORDER AND JUDGMENT***
_____

Before **HOLMES**, Chief Judge, **BACHARACH**, and **EID**, Circuit Judges.
_____

In February 2022, a jury convicted Jacquan Abe of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), use of a firearm in a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924. Before his trial began, Mr. Abe moved to suppress the use of witness identification evidence on the basis that the identification procedures were overly suggestive and the resulting identifications were unreliable; consequently, he reasoned, the use of the identification evidence would violate his due process rights. Mr. Abe also objected to the proposed identification testimony of

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1(a) and Tenth Circuit Rule 32.1(A).

his former probation officer and to the government's request to admit evidence from an uncharged incident that took place immediately prior to the charged conduct.

The district court denied the motion to suppress, allowed Mr. Abe's former probation officer to testify, and granted the government's motion to admit the evidence concerning the incident that occurred immediately before the charged conduct. After the jury returned a guilty verdict on all three counts, the district court sentenced Mr. Abe to 171 months' imprisonment. Mr. Abe now appeals, arguing that the district court erred by admitting the witness identification evidence, by allowing his former probation officer to testify, and by admitting the evidence from the incident prior to the charged conduct. In the alternative, he also argues that there was cumulative error. Lastly, he challenges his sentence as procedurally unreasonable because he asserts that the district court impermissibly based his sentence on rehabilitative concerns, in violation of *United States v. Tapia*, 564 U.S. 319 (2011).

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

**I**

**A**

*The Events at Dan's Automotive*

Garret Rice and his father own an auto repair shop in Albuquerque, New Mexico. There are surveillance cameras at the front and back of the store. On August 6, 2019, an individual—later identified as Mr. Abe—approached Garret Rice outside of Dan's Automotive complaining about the cameras in the back, which he believed were surveilling his home. The individual then left but, fearing he would

2

return, Mr. Rice retrieved his pistol from the shop.

The individual returned minutes later and attacked Mr. Rice. During the altercation, Mr. Rice's pistol fell to the ground and the individual picked it up. The individual pulled the trigger at least twice, but the gun did not fire. The individual then left in the direction of National Insurance, a nearby business, taking the gun with him. Mr. Rice called 911 and described the individual as a "big ole gigantic black guy" and estimated that he was approximately six feet tall, 250 pounds, and in his late twenties. Aplt.'s Suppl. App., Vol. II, Ex. 4, at 06:57–06:58 (Garret Rice 911 Call, dated Aug. 6, 2019).

*The Offense*

Minutes later (while Mr. Rice was still on the phone with 911), Mr. Abe entered National Insurance and pointed a gun at employee Rocio Amaya. He demanded that Ms. Amaya take him "to the money," and she led him to a petty cash box at the back of the business where he grabbed a handful of cash and then left the building. R., Vol. III, at 436 (Trial Tr., dated Feb. 24, 2022). Peter Cordova, an employee at the smoke shop next door, became aware of the commotion at National Insurance and came outside with his own gun. Mr. Abe tripped and fell—dropping the stolen gun—had a slight tussle with Mr. Cordova, and then ran away.

Ms. Amaya called 911 and reported the robbery. When the police arrived, she described the robber as a "big . . . black guy," around 5'9" or 5'10", with "curly [hair], like a little afro," and "wearing . . . a hoodie." Aplt.'s Suppl. App, Vol. II, Ex. 7, at 01:14–01:25, 01:45–01:48 (Bodycam Footage of Nat'l Ins., dated Aug. 6,

3

2019). Ms. Amaya told the police to talk to Mr. Cordova because he was "the one [who] actually saw him." *Id.* at 01:49–01:52. Mr. Cordova described the perpetrator as "African American, . . . about 5'7", 5'8" . . . [with] curly hair, [and] wearing a blue Highland High School sweatshirt and . . . blue sweats." Aplt.'s Suppl. App, Vol. II, Ex. 10, at 05:19–05:38 (Bodycam Footage of Peter Cordova, dated Aug. 6, 2019).

*Out-of-Court Identifications*

Two days after the robbery, an investigating officer presented photo arrays to Garret Rice, Rocio Amaya, and Peter Cordova. The officer had created the arrays using a computer program that chooses individuals with similar characteristics. The officer chose a total of five photos, including a prior booking photo of Mr. Abe, and the randomization software placed Mr. Abe's photo first in the array. At the time, these procedures were consistent with department policy, although the policies were later changed to require (1) that the photos be presented one at a time instead of together in an array, and (2) that they be presented by an officer not involved in the investigation. Before showing the photo array to each witness, the officer gave standard warnings that (1) the person the witness saw on the day of the incident may not be in the lineup; (2) the photos may be older or newer and characteristics, such as hair styles and facial hair, may have changed; and (3) lighting may affect the tone of the photograph, making people appear darker or lighter than in person.

When presenting the photo array to Mr. Rice, the officer stated, "do your best to point him out if you can." Aplt.'s Suppl. App, Vol. II, Ex. 4, at 05:54–05:58

(Bodycam Footage of Garret Rice Photo Identification, dated Aug. 8, 2019).  The officer also said that the incident was "unbelievable really" because it was "pretty clear that [the individual] tried to kill" Mr. Rice.  *Id.* at 06:26–06:42.  Mr. Rice then viewed the array and positively identified Mr. Abe as the individual.

Before the officer presented the photo array to Ms. Amaya, he reminded her about the incident, including asking: "Did you feel . . . I mean obviously you're getting robbed . . . did you feel there's a possibility that he might . . . shoot you or something?"  Aplt.'s Suppl. App, Vol. II, Ex. 8, 03:45–03:58 (Bodycam Footage of Rocio Amaya Photo Identification, dated Aug. 8, 2019).  When presented with the array, Ms. Amaya hesitated and then positively identified Mr. Abe, stating, "I think it was either . . . . I think it was the first one. . . yeah . . . the curly hairstyle."  *Id.* at 08:08–08:19.

When the officer presented the photo array to Mr. Cordova, Mr. Cordova hesitated and said, "it's between one and two."  Aplt.'s Suppl. App, Vol. II, Ex. 11, at 09:05–09:07 (Bodycam Footage of Peter Cordova Photo Identification, dated Aug. 8, 2019).  He then studied the photos for another moment and selected Mr. Abe.  After Mr. Cordova circled the photo of Mr. Abe, the officer told him to check the box that indicated he had made a positive identification.  Mr. Cordova noticed that there were other options for selecting that you were not sure if the individual was in the lineup, or that you did not believe the individual was in the lineup, but the officer directed him to check the positive identification box if that selection was correct and to sign the form, which Mr. Cordova did.

5

**B**

*Motion to Suppress Witness Identifications*

Before trial, Mr. Abe moved to suppress all out-of-court and in-court identifications by Garret Rice, Rocio Amaya, and Peter Cordova on the grounds that the identification procedures were overly suggestive, and the resulting identifications were unreliable. He reasoned that the admission of this identification evidence would violate his due process rights. After a hearing, the district court issued a written opinion denying the motion to suppress because (1) the photo array was not impermissibly suggestive; (2) the manner of presentations to Ms. Amaya and Mr. Cordova was not impermissibly suggestive; and (3) while the manner of presentation to Mr. Rice may have been impermissible because the officer's statement to "[d]o your best to point him out, if you can," suggested that the perpetrator was in fact in the lineup, the identification was nevertheless reliable because Mr. Rice did not hesitate in selecting his choice and had an extended encounter with the perpetrator during the incident. R., Vol. I, at 68 (Mem. Op. & Order Granting in Part & Den. in Part Def.'s Mot. to Suppress, filed Nov. 18, 2021).

*Government's Motion to Admit Evidence from Dan Automotive*

Next, the government filed a motion to admit evidence of the altercation with Garret Rice at Dan's Automotive on the grounds that it was intrinsic to the charged offenses or, in the alternative, that it was admissible extrinsic evidence. Mr. Abe opposed the motion. The district court held a hearing where defense counsel stated, "the only thing that we're asking to be excluded is the attempted firing of the

firearm," because that part of the surveillance video was not inextricably intertwined with the charged offenses and was more prejudicial than probative. R., Vol. III, at 134 (Tr. Pretrial Conference, dated Feb. 22, 2022). The district court granted the government's motion to admit the evidence.

*Objection to Government Witness List*

After the government filed its witness list, Mr. Abe objected to the proposed identification testimony of Edward Silva, Mr. Abe's former probation officer. The government intended to call Mr. Silva to identify Mr. Abe as the perpetrator on the Dan's Automotive surveillance video. The district court examined Mr. Silva outside the presence of the jury and then allowed the government to admit Mr. Silva's testimony because identity was the main issue in the case and the district court was assured that Mr. Silva's identification was reliable. Specifically, the district court mentioned that (1) Mr. Silva's identification was not prompted by law enforcement because he had seen the surveillance video on the news and remarked to his wife, "[t]hat's Mr. Abe," and (2) Mr. Silva supervises few African American individuals, making it more likely that he would remember Mr. Abe. R., Vol. III, at 416.

The district court also cited *United States v. Contreras*, 536 F.3d 1167 (10th Cir. 2008), in which the Tenth Circuit held that the district court in Mr. Contreras's case did not abuse its discretion by allowing his probation officer to identify him from a surveillance video. The court reasoned that the fact that "the crucial issue in this case [wa]s mistaken identity" supported the admission of Mr. Silva's identification testimony: Mr. Silva was someone familiar with the way Mr. Abe

walked and talked; as such, he was in a better position to identify Mr. Abe on the surveillance video than a jury viewing him in a courtroom setting. R., Vol. III, at 418. However, the district court agreed with defense counsel that Mr. Silva and the government would not reveal the nature of Mr. Silva's relationship with Mr. Abe. Instead, Mr. Silva would testify only that he became familiar with Mr. Abe in a professional setting.

*Mr. Abe's Trial*

At trial, Garret Rice identified Mr. Abe as the person he encountered on August 6, 2019. He testified that he remembered the date because he "was attacked that day" and he "got into a fight outside and . . . got shot at." R., Vol. III, at 323 (Trial Tr., dated Feb. 23, 2022). Mr. Rice testified that Mr. Abe pointed the gun right at his face and pulled the trigger several times and that he was left with a "big slash on [his] face" following the attack. *Id.* at 354. Lastly, Mr. Rice testified that he was driven by shock to break his sobriety and drank an entire bottle of vodka after the attack. The surveillance video from Dan's Automotive was played during Mr. Rice's testimony.

Edward Silva, Mr. Abe's former probation officer, testified that he knew Mr. Abe from his "professional life" and had encountered him "[a]t least four" times between November 2016 and January 2017. R., Vol. III, at 425. Mr. Silva also identified Mr. Abe as the individual on the Dan's Automotive surveillance video.

Rocio Amaya testified about the events at National Insurance. When asked if she saw the robber in the courtroom, she responded, "I'm not 100 percent sure." *Id.*

8

at 439.  The government asked Mr. Abe to remove his COVID-protective face mask, and Ms. Amaya said, "it's most likely him," but she was still "not 100 percent certain."  *Id.*  Peter Cordova testified about the events that occurred after Mr. Abe left National Insurance.  He identified Mr. Abe in the courtroom as the perpetrator.

The jury returned a verdict of guilty on all three counts.

*Sentencing*

Mr. Abe requested a downward variance from the sentencing guidelines range of 171–192 months to a sentence no longer than 120 months.  In support of the variance, Mr. Abe highlighted his mental health issues and BOP's inability to provide him with proper treatment.  Mr. Abe's probation officer agreed that a downward variance may be warranted in his case.  The district court, however, declined to vary downward and, instead, imposed a low-end, within-guidelines sentence of 171 months.  It also recommended that Mr. Abe participate in mental health, substance abuse, and educational programs while in custody and on supervised release.

**II**

**A**

"When reviewing the admission of a photo array [or other eyewitness evidence] used to identify a defendant, we apply the clear-error standard to factual findings and engage in de novo review of due-process issues."  *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014) (citing *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)).  "When we review a defendant's challenge to an

identification from the photo array [or other eyewitness identification procedure], we conduct a two-pronged inquiry." *Id.* "We first determine whether the photo array [or other eyewitness identification procedure] was unduly suggestive; if it is, we decide whether the identifications were still reliable in view of the totality of the circumstances." *Id.* "Ultimately, we must determine whether an unduly suggestive array [or other eyewitness identification procedure] created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). "If so, the defendant's due-process rights have been violated." *Id.*

**B**

We review evidentiary rulings for an abuse of discretion. *See Contreras*, 536 F.3d at 1170. We do not "disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *Id.* (quoting *United States v. Bush*, 405 F.3d 909, 915 (10th Cir. 2005)).

**C**

Under the cumulative error analysis, we "'aggregate[ ] all the errors that individually have been found to be harmless, and therefore not reversible, and . . . analyze[ ] whether their cumulative effect on the outcome of the trial is such that *collectively* they can no longer be determined to be harmless.'" *United States v. Starks*, 34 F.4th 1142, 1169 (10th Cir. 2022) (alterations and omission in original) (quoting *United States v. Lopez-Medina*, 596 F.3d 716, 740–41 (10th Cir. 2010)).

**D**

10

When reviewing the procedural reasonableness of a sentence where, as here, the defendant failed to preserve the issue in the district court, we review for plain error.  *See United States v. Farley*, 36 F.4th 1245, 1250 (10th Cir. 2022).  To show plain error, the defendant must show that: "(1) an error occurred; (2) the error was plain; (3) the error affected . . . substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of a judicial proceeding."  *Id.* (omission in original) (quoting *United States v. Wolfname*, 835 F.3d 1214, 1217 (10th Cir. 2016)).

## III

For the reasons that follow, we conclude that the admission at trial of the eyewitness identifications of Mr. Abe from the photo array did not violate his right to due process.  Ms. Amaya's in-court identification also did not violate due process.  The district court did not abuse its discretion in either allowing Mr. Abe's former probation officer to testify, or in admitting the evidence from the incident immediately prior to the offense.  Because the district court did not err in these respects, there is no basis to conduct a cumulative error analysis.  Further, Mr. Abe's sentence was procedurally reasonable.  Therefore, we affirm Mr. Abe's conviction and sentence.

## A

The district court's admission of the eyewitness identification evidence did not violate due process.  The composition of the photo array presented to Ms. Amaya, Mr. Cordova, and Mr. Rice was not impermissibly suggestive.  Further, the manner of presentation of the photo array to Ms. Amaya and Mr. Cordova was also not

impermissibly suggestive. And even if the manner of presentation of the photo array to Mr. Rice was impermissibly suggestive, his identification of Mr. Abe was nevertheless reliable. Further, Ms. Amaya's in-court identification of Mr. Abe was reliable—even if, for reasons discussed *infra*, the related identification procedure was unduly suggestive. Therefore, the admission of none of this eyewitness identification evidence violated due process.

**1**

**a**

When the constitutionality of a photo array is challenged, the due process clause requires a two-pronged inquiry. *See Sanchez*, 24 F.3d at 1261. First, we must determine whether the photo array was impermissibly suggestive. *See id.* at 1261–62. If the photo array was impermissibly suggestive, we must then decide whether the resulting identification was nevertheless reliable in view of the totality of the circumstances. *See id.* at 1262.

Courts use a number of factors to determine whether a photo array is impermissibly suggestive, including "[1] the size of the array, [2] the manner of its presentation by the officers, and [3] the details of the photographs themselves. *Id.* "[T]he number of photographs in an array is not itself a[n] [independent,] substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array." *Id.* We have held that, "[i]n six-photograph arrays, significant weight is given to irregularities." *United States v. Worku*, 800 F.3d 1195, 1203 (10th Cir. 2015).

"Even if the [photo] arrays [or other identification procedures] were overly suggestive, the identifications could violate due process only if the suggestiveness rendered the identifications unreliable in light of the totality of the circumstances." *Id.* at 1205; *accord Johnson v. City of Cheyenne*, 99 F.4th 1206, 1218–19 (10th Cir. 2024); *see also United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992) ("The mere fact that a lineup is unnecessarily suggestive is not enough to forbid admission of in-court identifications made by the lineup witnesses. The suggestiveness of the lineup must create a very substantial likelihood of irreparable misidentification; in short, the tainted lineup must so affect the witnesses' perceptions as to render their subsequent in-court testimony unreliable.").

As part of the reliability inquiry, "our analysis regularly focuses on five factors—the so-called *Biggers* factors." *Johnson*, 99 F.4th at 1219. They are the following: (1) the "witnesses' opportunity to view the suspect when the wrongful action was committed"; (2) the "witnesses' degree of attention"; (3) the "accuracy of [the] witnesses' prior description of the suspect"; (4) the "level of certainty demonstrated by the witnesses"; and (5) the "length of time between the wrongful action and the photo array" or other identification procedure. *Worku*, 800 F.3d at 1205; *see Johnson*, 99 F.4th at 1220 (applying the *Biggers* factors, where the alleged perpetrator challenged on due process grounds the officer's alleged "presentation of only his driver's license—without first obtaining a physical description of the intruder"—contending that this "prompted [the alleged victim] to identify him as the perpetrator"); *United States v. O'Neil*, 62 F.4th 1281, 1285, 1288 (10th Cir. 2023)

13

(applying the *Biggers* factors, in assessing the reliability of an "in-field identification" procedure or "show-up," where the government did not challenge the proposition that the procedure was "unnecessarily suggestive").

**b**

Mr. Abe argues that the visual differences between his photo and the others in the array were "notable," and further amplified by the small size of the array (five photos). Aplt.'s Opening Br. at 37. More specifically, Mr. Abe argues that (1) he had the "curliest hair of anyone in the group"; (2) his photo "was taken within a closer range than the others"; and (3) his photo is "lighter than the others." *Id.* at 37–38. Because of these differences in the photos, Mr. Abe asserts that law enforcement's use of the array was improper and the admission into evidence of the identifications resulting from that use violated his due process rights. We disagree.

**i**

First, we conclude that the photo array itself is not impermissibly suggestive. In addressing Mr. Abe's arguments regarding the alleged suggestiveness of the array, the district court first noted that Mr. Abe "has curlier hair than the others, but [three other] individuals [in the array] also have varying levels of curls. The Court does not perceive that Defendant appears younger, heavier, or lighter or darker skinned than any of the other photos." R., Vol. I, at 69. The court further found the following: "While there are some minor differences in lighting and angles in the photographs, the Court does not find that these differences render Defendant's photograph

14

strikingly different from the others. Therefore, this factor weighs against suppression." *Id.* (citations and quotation marks omitted).

These findings are not clearly erroneous. Indeed, the individuals in the photo array share similar characteristics with Mr. Abe, are wearing similar clothing, and are positioned against a similar backdrop. Each of the individuals is an African American man, with a similar skin tone, and of a similar age. Mr. Abe's photo is slightly closer to the camera than the others, but all have similar expressions. The lighting in Mr. Abe's photo is on par with the second and third photos, and his hair is not markedly different in texture (or "curliness") from the other men in the photos.

Therefore, we conclude that the district court did not err in concluding that the photo array was not impermissibly suggestive. Mr. Abe's photograph is not the sort of "oddball" picture "likely to 'jump out' at a witness" that would make the photo array impermissibly suggestive. *Sanchez*, 24 F.3d at 1262; *see also Worku*, 800 F.3d at 1204 ("[A]ll are color photographs and depict Ethiopian men of similar ages. With these similarities among the men depicted, the court had the discretion to conclude that the differences in lighting would not have suggested which photograph to pick and did not clearly err by concluding that no particular individual stuck out within the array."). In other words, viewed in isolation, the photo array is not impermissibly suggestive.

**ii**

Next, we conclude that the manner of presentation of the photo array was not impermissibly suggestive as to Rocio Amaya and Peter Cordova.

15

The district court held that the manner of presentation of the photo array was not impermissibly suggestive as to Rocio Amaya and Peter Cordova. However, it found that the manner of presentation as to Garret Rice "weigh[ed] slightly in favor of suppression" because of the officer's instruction to Mr. Rice to, "[d]o your best to point him out, if you can." R., Vol. I, at 70.[1]

On appeal, Mr. Abe argues that (1) the manner of presentation was also impermissibly suggestive as to Ms. Amaya because the officer "play[ed] up the gravity of the event" before showing her the photos, which "encouraged her to make an identification"; (2) the officer "pressured" Mr. Cordova to make an identification because, after he had identified Mr. Abe, the officer pushed him to check the "made positive identification" box instead of giving him time to review the "uncertain" and "not pictured" options; and (3) the presentation of the array went against an enacted but not-yet-effective New Mexico statute and guidance from the Department of Justice ("DOJ"). Aplt.'s Opening Br. at 35.

Mr. Abe cites no law in support of his argument that these elements tainted the manner of presentation of the photo array, and we conclude that they did not. First, we agree with the government that victims of trauma already appreciate the gravity of the matter, and an officer reminding them of the events does not necessarily encourage them to make a positive identification. *See* Aplee.'s Resp. Br. at 39.

---

[1]    The government does not contest that the manner of presentation to Mr. Rice was suggestive, so we will assess his identification only for whether it was nevertheless reliable.

16

Second, Mr. Cordova was informed up-front that not making an identification because he was unsure or because he did not believe the individual was in the lineup was an option. Yet once Mr. Cordova did make a positive identification, it was appropriate for the officer to direct him regarding the correct way to fill out the form.

Lastly, the New Mexico statute Mr. Abe cites was not effective at the time of the photo array. *See* N.M. STAT. ANN. § 29-3B-3 (West 2019). And the DOJ guidance specifically states that it is non-binding. *See* R., Vol. I, at 53 (DOJ Eyewitness Identification Procs. for Conducting Photo Arrays, filed Sept. 7, 2021) ("This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nothing in these procedures implies that an identification not done in accordance with them is unreliable or inadmissible in court."). Therefore, the manner of presentation of the photo array to Ms. Amaya and Mr. Cordova was not impermissibly suggestive.

**iii**

Lastly, as to Garret Rice, even if the manner of presentation of the photo array was impermissibly suggestive because of the officer's direction to, "[d]o your best to point him out, if you can," his identification was nevertheless reliable. R., Vol. I, at 70.

Mr. Abe argues that Mr. Rice did not spend a "significant amount of time with the perpetrator" because "[t]he auto shop encounter lasted less than three minutes." Aplt.'s Opening Br. at 40. He also argues that Mr. Rice's attention was on the

weapon pointed at his face instead of on the perpetrator. Mr. Abe specifically points to the fact that Mr. Rice could not remember what Mr. Abe was wearing when he called 911 and was "in shock" and "drank an entire bottle of vodka" after the incident, further impairing his memory. *Id.* at 41. Finally, Mr. Abe notes that Mr. Rice overestimated Mr. Abe's stature, at "well over six feet," and could not describe any specific features except for his race. *Id.* at 42.

We disagree that these factors make Mr. Rice's identification unreliable. The district court did not clearly err in concluding that Mr. Rice had ample opportunity to observe the perpetrator because he "observed the perpetrator outside in the broad daylight," "[t]he perpetrator's face and head were not obscured," and the perpetrator "was within striking distance" of Mr. Rice. R., Vol. I, at 71. Further, as the district court plausibly found, Mr. Rice "interacted with the perpetrator during the assault before any weapons were introduced"; that is, his full attention was on the perpetrator during the portion of the encounter where they were talking about the surveillance cameras. *Id*. The court also did not clearly err in finding that Mr. Rice "gave a detailed description of the perpetrator" that was "reasonabl[y] accurate." *Id.* And he provided a "detailed account of the incident which was corroborated by surveillance video." *Id.* Lastly, when presented with the photo array, as the court plausibly found, Mr. Rice "did not hesitate in making his identification and confidently stated that [Mr. Abe] was the perpetrator." *Id.*

Therefore, based on these findings, we conclude that—under the *Biggers* factors—Mr. Rice's identification was reliable even if the manner of presentation of

the photo array was impermissibly suggestive. Consequently, the admission of his identification testimony did not violate Mr. Abe's due process rights.

**2**

Mr. Abe also argues that "[Rocio] Amaya's in-court identification was independently unconstitutional." Aplt.'s Opening Br. at 47. Mr. Abe maintains that when Ms. Amaya expressed uncertainty about whether the perpetrator was in the courtroom, the government directed Mr. Abe to remove his face mask; that allegedly "spotlighted the defendant [and] rendered the procedure unduly suggestive." *Id.* Regardless of whether that is so, we conclude that Ms. Amaya's in-court identification was reliable. Therefore, its use at trial did not violate Mr. Abe's due process rights.

The government requesting that a defendant remove their face mask to assist with an identification is an issue unique to the COVID-era that the Fourth Circuit recently addressed in *United States v. Ross*, 72 F.4th 40 (4th Cir. 2023). In that case, the government asked if the witness saw Jacob Ross (the defendant) in the courtroom and the witness said no. *See id.* at 45. The government then asked the defendant to remove his face mask, at which point the witness positively identified the defendant as Jacob Ross. *Id.* at 45–46. The Fourth Circuit conducted a due process analysis and concluded that, even if the identification procedure was impermissibly suggestive, the witness's in-court identification was nevertheless reliable using the *Biggers* factors because she was so familiar with the defendant. *Id.* at 50. The Fourth Circuit also highlighted that, "[r]egardless of how suggestive the procedure

19

might have been, [the witness's] in-court identification of Ross was 'still only

evidence,' . . . Ross's defense counsel had an opportunity to 'both cross-examine the

identification witness[ ] and argue in summation as to factors causing doubts as to the

accuracy of the identification—including . . . any suggestibility in the identification

procedure.'  Thus, any error in admitting [the witness's] identification was not

'unquantifiable and indeterminate.'"  *Id.* at 47–48 (third alteration in original) (first

quoting *Manson v. Brathwaite*, 432 U.S. 98, 113 n.14 (1977); then quoting *United*

*States v. Poole*, 640 F.3d 114, 119 (4th Cir. 2011)).

    Here, Ms. Amaya's in-court identification was similarly reliable even if the

identification procedure was impermissibly suggestive.  She had a good opportunity

to view and interact with Mr. Abe during the robbery, as she spoke with him one-on-

one and led him to the back of the National Insurance office.  *See Biggers*, 409 U.S.

at 199 ("[The] factors to be considered . . . include the opportunity of the witness to

view the criminal at the time of the crime [and] the witness'[s] degree of attention.").

Ms. Amaya also accurately described Mr. Abe after the incident.  *See id.* ("[The]

factors to be considered . . . include . . . the accuracy of the witness'[s] prior

description of the criminal.").  She gave another accurate description at trial,

describing the perpetrator as "dark skinned," "taller than [her]," with "[c]urly hair,"

"[w]ide lips," and a "[b]ig nose" in his "[e]arly twenties."  R., Vol. III, at 437.  While

Ms. Amaya expressed a low amount of confidence in each of her identifications and

her identification at the trial took place two-and-a-half years after the incident, the

20

circumstances of her encounter with Mr. Abe and the consistency of her descriptions render her in-court identification nevertheless reliable.

Furthermore, because Ms. Amaya's identification was an in-court identification, the jury was aware of her level of uncertainty, and it was therefore up to the jury to decide whether or not to credit the identification.[2] *See United States v. Thomas*, 849 F.3d 906, 911 (10th Cir. 2017) ("[E]videntiary reliability is traditionally a question for the jury, not the judge, and . . . other due-process protections are in place that limit the weight the jury attributes to evidence that may be unreliable. . . . Mr. Thomas was able to confront the witness during cross-examination with the assistance of competent counsel. . . . [Ultimately,] [w]hether to credit the in-court identification was the province of the jury." (citing *Perry v. New Hampshire*, 565 U.S. 228, 245–46 (2012))).  As such, Ms. Amaya's in-court identification did not violate due process.

\* \* \*

Therefore, for the foregoing reasons, we conclude that Mr. Abe's due process rights were not violated by the use of eyewitness identification evidence in this case.

---

[2]    Recall that after Mr. Abe removed his face mask, Ms. Amaya stated that the perpetrator was "most likely him" but she was "[n]ot 100 percent certain." R., Vol. III, at 439.  Relatedly, the government questions whether Ms. Amaya gave an in-court "identification" at all in light of her uncertainty.  *See* Aplee.'s Resp. Br. at 42 ("The removal of Abe's mask could not be unnecessarily suggestive if it failed to result in a definitive in-court identification.").  We need not opine on that point because we conclude that even if she did offer a cognizable in-court identification of Mr. Abe, it was reliable, and its use at trial accordingly did not violate Mr. Abe's due process rights.

**B**

Mr. Abe next argues that the district court abused its discretion in allowing Edward Silva to identify Mr. Abe on the surveillance video because Mr. Silva was not more likely than the jury to identify the perpetrator from the video, given his limited interactions with Mr. Abe. Mr. Abe also argues that Mr. Silva's testimony was more prejudicial than probative. However, we conclude that the district court did not abuse its discretion by allowing Mr. Silva to identify Mr. Abe because there was some basis to conclude that Mr. Silva was more likely to correctly identify Mr. Abe than the jury, and his testimony was not more prejudicial than probative.

**1**

Federal Rule of Evidence 701 bars lay witnesses from offering opinion testimony unless it is "helpful to . . . determining a fact in issue." FED. R. EVID. 701. A witness's identification testimony satisfies this rule if "there is some basis for concluding that the witness is more likely to correctly identify the defendant . . . than is the jury." *Contreras*, 536 F.3d at 1170 (citation and quotation marks omitted). "The witness's prior familiarity with the defendant's appearance is the most critical factor [in] determin[ing] if such a basis exists." *Id.*

Mr. Abe argues that Mr. Silva supervised Mr. Abe for "less than two months approximately six years prior to trial." Aplt.'s Opening Br. at 49. He "saw Mr. Abe four to six times total, every time in the same location," and Mr. Abe "was one out of 400–500 probationers Mr. Silva supervised" throughout his career. *Id.* at 50. However, we agree with the district court that there was still "some basis" for

22

concluding that Mr. Silva was more likely to correctly identify Mr. Abe from the surveillance video than the jury. *Contreras*, 536 F.3d at 1170. Mr. Silva had familiarity with the way Mr. Abe "walked and some of [his] facial features," which the jury was not going to be able to observe at trial with Mr. Abe seated and wearing a face mask. R., Vol. III, at 416; *see Contreras*, 536 F.3d at 1170 (noting that the witness "had repeated interactions with [the defendant], and thus could identify him based on many factors that would not be apparent to a jury viewing the defendant only in a courtroom setting"). Further, the concern that Mr. Silva was not familiar enough with Mr. Abe to make a correct identification is alleviated by the fact that he came forward on his own, having independently identified Mr. Abe from the surveillance video that he saw on television. Therefore, the district court did not abuse its discretion in determining that Mr. Silva's identification testimony was admissible under Rule 701.

2

Federal Rule of Evidence 403 provides that "[a] court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Mr. Abe argues that, even if Mr. Silva's identification was admissible under Rule 701, it was more prejudicial than probative under Rule 403. Specifically, Mr. Abe argues that "[t]he government introduced no other evidence of Mr. Abe's criminal history at trial [and] Mr. Silva's testimony was the only potential source of

23

this information, which, as this Court has noted, would be extremely prejudicial if put before the jury." Aplt.'s Opening Br. at 53–54. Further, Mr. Abe argues that he was forced to limit his cross-examination "[t]o avoid introducing this prejudicial evidence." *Id.* at 54.

However, the record shows that the district court did not abuse its discretion in determining that Mr. Silva's testimony was not more prejudicial than probative. First, the fact that Mr. Silva was Mr. Abe's former probation officer was never put before the jury. Mr. Silva testified only that he knew Mr. Abe from his "professional life," and never mentioned that his profession was as a probation officer. R., Vol. III, at 425. Next, the record shows that defense counsel was able to confront Mr. Silva in a reasonably effective manner on cross-examination about his limited interactions with Mr. Abe—including that "during th[e] approximately two, two-and-a-half month period, [Mr. Silva] met with Mr. Abe maybe four times for possibly 15 minutes" each, and that Mr. Silva "ha[d] not seen [Mr. Abe] in person since January of 2017." *Id.* at 430.

Further, this Court has previously held that a district court did not abuse its discretion in allowing a probation officer to identify a defendant, even where defense counsel declined to cross-examine the probation officer *at all*. *See Contreras*, 536 F.3d at 1171–73. Therefore, Mr. Silva's testimony was not more prejudicial than

probative, and the district court did not abuse its discretion in allowing him to testify.[3]

## C

The district court did not abuse its discretion by admitting evidence of the encounter at Dan's Automotive, including Garret Rice's testimony and the full surveillance video, because it applied the correct legal standard to accurately determine that the events at Dan's Automotive were intrinsic to the charged crimes.

## 1

Mr. Abe argues on appeal that the district court applied the incorrect legal standard in determining whether the other-acts evidence at Dan's Automotive was intrinsic to the crimes charged. Specifically, Mr. Abe asserts that the district court applied a relevance standard rather than "asking whether the evidence was 'inextricably intertwined' with the charged offenses." Aplt.'s Opening Br. at 24.

The record does not support this argument. During the hearing, the district court explicitly stated, "I'll start with the proposition that evidence is relevant if it's inextricably intertwined with the charged offenses." R., Vol. III, at 139. The district court then found that (1) the identity of the Dan's Automotive perpetrator was inextricably intertwined with the identity of the National insurance robber; (2) the

---

[3]     Mr. Abe also points to Eighth and Ninth Circuit cases that hold that identifications by parole officers should be used only if there are no other identification means available. *See United States v. Farnsworth*, 729 F.2d 1158, 1161 (8th Cir. 1984); *United States v. Butcher*, 557 F.2d 666, 670 (9th Cir. 1977). But, as he concedes, the Tenth Circuit has not adopted this position. *See* Aplt.'s Opening Br. at 55; *Contreras*, 536 F.3d at 1171–73. And we decline to do so now.

confrontation shows how the Defendant obtained the gun he allegedly used to commit the robbery; and (3) the confrontation went directly toward proving the possession of a stolen firearm charge. The court stated again, "all of this is inextricably intertwined"; "[i]t's all res gestae, it's intertwined." *Id.* at 140. Therefore, the district court properly analyzed the events at Dan's Automotive for whether they were inextricably intertwined with the charged crimes; Mr. Abe's contentions to the contrary lack merit.

### 2

The district court also correctly concluded that the events at Dan's Automotive were intrinsic to the charged crimes. "[I]ntrinsic evidence is that which is 'directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.'" *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (quoting *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009)). "We have held that '[o]ther act evidence is intrinsic'—and thus not subject to Rule 404(b)—'when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" *Id.* (alteration in original) (quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993)).

"Indications that evidence is intrinsic include situations in which the evidence [1] was inextricably intertwined with the charged conduct, [2] occurred within the same time frame as the [charged] activity . . . , [3] was a necessary preliminary to the

charged [activity], [4] provided direct proof of the defendant's involvement with the charged crimes, and [5] was entirely germane background information, directly connected to the factual circumstances of the crime, or [6] was necessary to provide the jury with background and context of the nature of the defendant's relationship to his accomplice." *United States v. Cushing*, 10 F.4th 1055, 1075–76 (10th Cir. 2021) (citing *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015)); *see also United States v. Durham*, 902 F.3d 1180, 1224 (10th Cir. 2018) ("Evidence is intrinsic when it is 'directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.'" (quoting *Kupfer*, 797 F.3d at 1238)).

Here, the district court did not abuse its discretion in determining that "[t]he confrontation with the auto shop employee, Mr. Rice, shows how the Defendant obtained the gun that he allegedly used to commit the robbery." R., Vol. III, at 139–40. This fact is "directly connected to the factual circumstances" of Count III, possession of a stolen firearm, because it shows that Mr. Abe "kn[ew] or ha[d] reasonable cause to believe that the firearm . . . was stolen"—an element of 18 U.S.C. § 922(j). *See Irving*, 665 F.3d at 1212. It also "provides contextual or background information" as to the Hobbs Act robbery and use of a weapon in a crime of violence charges because the altercation at Dan's Automotive was a "necessary preliminary" to those offenses, which could not have been charged without the use of a firearm. *Cushing*, 10 F.4th at 1075–76; *see also* 18 U.S.C. §§ 1951(a), 924(c)(1)(A)(ii).

Lastly, the assault and attempted firing of the gun "occurred within the same time frame," *Cushing*, 10 F.4th at 1075, as the charged criminal conduct and was "part of a single criminal episode," *Irving*, 665 F.3d at 1212. Mr. Abe stole the firearm and committed the assault within the same minute, and robbed National Insurance while Mr. Rice was still on the phone with 911 reporting the assault. Therefore, the district court did not abuse its discretion in finding that the entire incident at Dan's Automotive was "inextricably intertwined" with the charged offenses and therefore admissible intrinsic evidence.[4]

**3**

Even if evidence is intrinsic, "[s]uch evidence may still be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Irving*, 665 F.3d at 1212 (quoting FED. R. EVID. 403). "[W]e note that unfair prejudice does more than damage the Defendant's position at trial. Indeed, relevant evidence of a crime which the government must introduce to prove its case is by its nature detrimental to a defendant who asserts that he is not guilty of the charged offense." *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001). "'Unfair prejudice' within its context means an undue tendency to suggest decision

---

[4] The district court found in the alternative that even if the events at Dan's Automotive did not constitute intrinsic evidence, they were also admissible as extrinsic other-acts evidence under Federal Rule of Evidence 404(b). *See* R., Vol. III, at 141. Although "[i]f the contested evidence is intrinsic to the charged crime, then Rule 404(b) is not . . . applicable," *Irving*, 665 F.3d at 1212, we conclude that the district court's 404(b) analysis is also sound and provides an alternative ground for affirmance.

on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403 advisory committee's note to 1972 amendment; *accord Tan*, 254 F.3d at 1211.  However, "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" *Tan*, 254 F.3d at 1211 (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)).

Mr. Abe asserts that admitting the full sequence of events at Dan's Automotive rather than the most relevant subset was more prejudicial than probative. Specifically, he asserts that "[Mr.] Rice's testimony was not highly probative of identity" and "[w]hile the portion of the surveillance footage showing the perpetrator picking up the gun may have been probative, nothing before it was.  And outside of establishing identity, the evidence of the encounter had zero probative value." Aplt.'s Opening Br. at 30.  Further, "[t]he lurid details of [Mr.] Rice's experience undoubtedly provoked an emotional response in the jury. . . . The testimony ensured that the jury knew that the encounter, which, again, was not in itself part of any charged conduct, was violent.  These details would doubtless give the jury a negative impression, potentially compelling them to convict him regardless of whether the evidence established beyond a reasonable doubt that he committed the charged crimes." *Id.* at 31.

This argument is unavailing.  The district court did not abuse its discretion in determining that "with the appropriate limiting instruction, this evidence [wa]s not

unfairly prejudicial." R., Vol. III, at 142.[5] "[G]iven the Defendant's defense is mistaken identity," *id.* at 141, "all of this violent confrontation with Garrett Rice, who is the chief eyewitness and the only one who is backed up by videotape, is crucial[,]" *id.* at 138. And as the government correctly argues, the charged crimes already suggested that Mr. Abe had violent tendencies and was a threat to the safety of the public.

Therefore, the district court did not abuse its discretion in determining that the events at Dan's Automotive were not prejudicial over and above the charged conduct, and any prejudice was substantially outweighed by the probative value of the evidence on the question of identity of the perpetrator of the crime. In sum, the district court did not abuse its discretion in admitting the evidence from Dan's Automotive.

**D**

Where a district court's errors, taken alone, are determined to be individually harmless (and therefore not reversible) but, taken together, can no longer be determined to be harmless, then they may nonetheless violate the defendant's right to a fair trial. *See Starks*, 34 F.4th at 1169–70. However, where no matters are determined to be error, then there can be no cumulative error. *See Lopez-Medina*, 596 F.3d at 741 ("Where, as here, a defendant 'has failed to establish the existence of

---

[5]    The limiting instruction the district court gave was that the jury may consider the "assault on Garrett Rice . . . only as it bears on the Defendant's motive, intent, preparation, plan, knowledge, and identity, and for no other purpose." R., Vol. I, at 282 (Jury Instr. No. 19, filed Feb. 25, 2022).

multiple non-reversible errors (i.e., harmless errors and plain errors failing to necessitate reversal)[,] . . . he cannot benefit from the cumulative error doctrine.'" (alteration and omission in original) (quoting *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007))). "[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990).

There are no errors—let alone harmless ones—to cumulate here. As we have just concluded, the district court did not err in admitting the eyewitness identifications, did not err in admitting Edward Silva's identification of Mr. Abe, and did not err in admitting the testimony and video from the encounter at Dan's Automotive. Therefore, there were no errors here that could form the basis for a cumulative error analysis.

**E**

Finally, we conclude that Mr. Abe's sentence was procedurally reasonable. Although Mr. Abe argues that "the district court improperly lengthened his sentence based on rehabilitative concerns and improperly treated Mr. Abe's mental illness as an aggravating factor," Aplt.'s Opening Br. at 57, the record does not reflect that the district court erred in these respects. Mr. Abe's sentence was procedurally reasonable.

### 1

Mr. Abe tacitly concedes what the record shows—he did not object to the district court's sentence on the ground that it improperly considered rehabilitative concerns. Reflecting this, Mr. Abe invokes the plain error standard. *See* Aplt.'s Opening Br. at 61 (contending that the court was "committing plain error" by considering "Mr. Abe's rehabilitative needs"); Aplt.'s Reply Br. at 19 (asserting that the district court committed "plain *Tapia* error"). To show plain error, the defendant must show: "(1) an error occurred; (2) the error was plain; (3) the error affected . . . substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of a judicial proceeding." *Farley*, 36 F.4th at 1250 (omission in original) (quoting *Wolfname*, 835 F.3d at 1217). A district court commits procedural error in sentencing a defendant when it fails to adequately explain the sentence imposed or when it relies on an impermissible factor in fashioning a sentence. *See United States v. Mendoza*, 543 F.3d 1186, 1191 (10th Cir. 2008).

### 2

The district court did not impermissibly impose or lengthen Mr. Abe's sentence to promote rehabilitation. In *Tapia v. United States*, 564 U.S. 319 (2011), the Supreme Court held that "a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." *Id.* at 335. In *Tapia*, the district court lengthened the defendant's sentence so that she could complete a 500-hour drug program, which the Supreme Court found impermissible. *See id.* at 334–35.

32

Mr. Abe argues that "the district court explicitly considered Mr. Abe's need for mental health support in declining to vary downward, despite probation's recommendation to the contrary." Aplt.'s Opening Br. at 60. Mr. Abe points specifically to the portion of the sentencing hearing where "[t]he court opined that Mr. Abe benefitted from a 'structured environment' and it had 'some concerns that when the structure is not there, whether he can remain compliant with conditions and also continue to take his medications.'" *Id.* at 61. Yet the record does not support Mr. Abe's assertion of procedural error because it is clear that the district court considered Mr. Abe's ability to remain stable in a structured environment in the context of assessing permissible sentencing factors—not as a distinct ground for lengthening his sentence.

The district court began by addressing 18 U.S.C. § 3553(a)(2)(D), the rehabilitation sentencing factor. The district court imposed various conditions of supervised release to address this factor and recommended that BOP provide Mr. Abe with educational and mental health services while in prison. But the district court did not mention the length of Mr. Abe's sentence in this portion of the colloquy.

The district court then turned "back now to number (1), the nature and circumstances of the offense, and the history and characteristics of the Defendant," which is where the district court's statement about Mr. Abe succeeding in a "structured environment" occurred. R., Vol. III, at 781–82, 785 (Tr. Sent'g Hr'g, dated July 7, 2022). The district court considered Mr. Abe's propensity for violence when he does not take his mental health medications as part and parcel of its

33

evaluation of the circumstances of the offense, *see id.* at 781–82 (observing that "if

he had been taking mental health medications back around the time this incident

happened, maybe we wouldn't be here"); the history and characteristics of the

defendant, *see id.* at 782 (noting that he had a history of not "remain[ing] compliant

with conditions"); and protecting the public from further crimes of the defendant, *see

id.* at 785 (stating that "the concern I have is that if he's not in a structured

environment and he doesn't take his medications, then he can again go off and

endanger, needlessly endanger members of the public").  Therefore, the district court

considered Mr. Abe's ability to remain stable in a structured environment in

connection with its assessment of permissible § 3553(a) sentencing factors, rather

than considering Mr. Abe's needed medical care or other rehabilitative concerns as a

basis for imposing or lengthening his sentence.  As such, the district court did not

commit a *Tapia* error.

### 3

Mr. Abe lastly argues that even if the district court did not commit a *Tapia*

error, the district court "erred in relying on mental health as an aggravating factor."

Aplt.'s Opening Br. at 61.  This argument is unavailing.

First, the case Mr. Abe cites for this proposition, *Tennard v. Dretke*, 542 U.S.

274 (2004), arises in the death penalty context regarding defendants with intellectual

disabilities, which is a markedly different situation—in fact and in legal

framework—than Mr. Abe's situation.  *See id.* at 285–88.  And second—as explained

above—the record shows that, to the extent the district court considered Mr. Abe's

34

mental health, it did so in the context of assessing permissible § 3553(a) factors. The fact that the court elected not to vary downward and, instead, imposed a within-guidelines sentence does not, without more, signal that the court treated his mental health as an aggravating factor. *Cf. United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) ("[W]e presume that a sentence within the properly calculated guidelines range is reasonable"). And Mr. Abe offers nothing that persuades us that the court did that.

\*\*\*

Therefore, we conclude that Mr. Abe's sentence was procedurally reasonable.

**IV**

For the foregoing reasons, we **AFFIRM** the district court's judgment.

Entered for the Court

Jerome A. Holmes
Chief Judge